**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Justin L. Venus

     v.                             Case No. 17-cv-482-PB
                                       Opinion No. 2019 DNH 005

Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration

<u>**O R D E R**</u>

Justin Venus moves to reverse the decision of the Acting

Commissioner of the Social Security Administration ("SSA") to

deny his application for Social Security disability insurance

benefits, or DIB, under Title II of the Social Security Act, 42

U.S.C. § 423. The Acting Commissioner, in turn, moves for an

order affirming her decision. For the reasons that follow, the

decision of the Acting Commissioner, as announced by the

Administrative Law Judge ("ALJ") is affirmed.

**I. Standard of Review**

The applicable standard of review in this case provides, in

pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing. The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

1

42 U.S.C. § 405(g). However, the court "must uphold a denial of social security disability benefits unless 'the [Acting Commissioner] has committed a legal or factual error in evaluating a particular claim.'" Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the standard of review that applies when an applicant claims that an SSA adjudicator made a factual error,

> [s]ubstantial-evidence review is more deferential than it might sound to the lay ear: though certainly "more than a scintilla" of evidence is required to meet the benchmark, a preponderance of evidence is not. Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted). Rather, "[a court] must uphold the [Acting Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (per curiam).

Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018). In addition, "'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [Acting Commissioner],' and 'the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [her], not for the doctors or for the courts.'" Id. (quoting Rodriguez, 647 F.2d at 222). Thus, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so

long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).

## II. Background

The parties have submitted a Joint Statement of Material Facts. That statement, document no. 16, is part of the court's record and will be summarized here, not repeated in full.

When he applied for DIB, Venus was 38 years old. His primary employment had been as a property maintenance worker.

On September 7, 2010, after being diagnosed with "[b]ilateral hip osteoarthritis and cam lesions," Administrative Transcript (hereinafter "Tr.") 633, Venus had a surgical procedure known as "hip resurfacing arthroplasty," id.[1] According to a preoperative note, Venus weighed 237 pounds in July of 2010.

At a follow-up visit with Dr. Phat Nguyen in July of 2011, Venus reported that his "[h]ip pain [was] better after surgery," Tr. 263, that he had "been able to be more active," id., and that he was "[l]osing weight slowly," id. Based upon a musculoskeletal examination, Dr. Nguyen reported that Venus was negative for gait problems. He also reported that Venus weighed 231 pounds.

---

[1] Arthroplasty is "[a]n operation to restore as far as possible the integrity and functional power of a joint." Stedman's Medical Dictionary 161 (28th ed. 2006).

At an October 2012 two-year follow-up visit at his surgeon's office, Venus reported that: (1) "his pain [was] markedly improved over preoperative status," Tr. 534; (2) he had "been ambulating with no assistive device," id.; and (3) he was "continuing to work as a maintenance manager and overall [was] doing well with that," id. In addition, the physician's assistant who saw Venus reported that "X-rays show[ed] a well-placed prosthesis with no evidence of fracture or loosening." Tr. 535.

Venus began reporting hip pain in February of 2013. In March, he saw Dr. Nguyen and complained of hip pain. Dr. Nguyen reported Venus's weight as 252 pounds. Under the heading "Assessment and Plan" he wrote:

> P[atien]t can walk for up to 5-10 miles a day at this
> time. I think his hip pain is due . . . at least
> partly to obesity and walking.

Tr. 518. In June of 2013, Venus was ambulating with an antalgic gait.[2] By November of 2013, Venus's left hip had failed completely. He had it replaced in December of 2013. A preoperative note listed his weight as 234 pounds and his BMI as

---

[2] An antalgic gait is "a characteristic [gait] resulting from pain on weight-bearing in which the stance phase of [gait] is shortened on the affected side." Stedman's, supra note 1, at 781.

31.91.[3]  Three weeks after his left hip was replaced, Venus was

ambulating without an antalgic gait.  In April of 2014, he had

his right hip replaced.  A preoperative note listed his weight

as 253 pounds and his BMI as 33.48.  Two weeks after his right

hip was replaced, Venus was ambulating with an antalgic gait,

but "without a Trendelenburg gait," Tr. 409.[4]  Several weeks

later, he was ambulating without an antalgic gait.

In July of 2014, Venus applied for DIB, claiming to have

been disabled since September 9, 2010, as a result of "[h]ip

problems."  Tr. 69.  In an undated Adult Disability Report that

Venus submitted in support of his application for DIB, he

reported his weight as 235 pounds.

On September 18, 2014, Venus saw Dr. Bryan Lawless for a

six-month follow-up on his right hip replacement and a ten-month

follow-up on his left hip replacement.  Dr. Lawless's physical

examination revealed: (1) ambulation without an antalgic gait or

---

[3] BMI is an "[a]bbreviation for body mass index," Stedman's,
supra note 1, at 233 (emphasis omitted), which is "an
anthropometric measure of body mass, defined as weight in
kilograms divided by height in meters squared," id. at 963.
Guidelines promulgated by the National Institutes of Health
define BMIs of 30 to 34.9 as Level I obesity, and define BMIs of
35 to 39.9 as Level II obesity.  See Social Security Ruling 02-
1p, 2002 WL 34686281, at *2 (S.S.A. Sept. 12, 2002).

[4] A Trendelenburg gait is defined as "compensatory during
the stance phase of [gait] list of body (or throw of trunk) to
the weak gluteal side, to place the center of gravity over the
supporting lower extremity."  Stedman's, supra note 1, at 781.

a Trendelenburg gait; (2) no pain with hip flexion to 110 degrees; (3) no pain with hip rotation; and (4) a "well aligned and well fixed total hip component with no evidence of lucency, subsidence, or osteolysis," Tr. 393,[5] as documented by an X-ray. Dr. Lawless concluded: "No issues [status post] total hip arthroplasty. His exam reveals hips working well," Tr. 394.

On September 20, 2014, two days after Venus saw Dr. Lawless, his eligibility for disability insurance benefits expired. In other words, September 20 was Venus's date last insured ("DLI") for DIB.

In December of 2014, about two months after Venus's DLI, he saw Dr. Waverly Green, on a referral from his primary-care provider, "for evaluation of obstructive sleep apnea syndrome." Tr. 771. Dr. Green gave Venus a principal diagnosis of snoring and additional diagnoses of APNEA, insomnia, and restless-leg syndrome. He also indicated his strong suspicion that Venus had obstructive sleep apnea ("OSA"), and he arranged for a sleep study. In his report on Venus's sleep study, which was conducted in January of 2015, Dr. Green made two diagnoses: (1) moderate OSA; and (2) "[c]omorbid medical conditions

---

[5] Lucency is "a region in [a radiological] image caused by an absorber of lower x-ray attenuation than its surrounding tissues; in general, the opposite of opacity." Stedman's, supra note 1, at 1120. Osteolysis is "[s]oftening, absorption, and destruction of bony tissue, a function of the osteoclasts." Id. at 1390.

include[ing] obesity, hypertension, insomnia, and excessive daytime sleepiness," Tr. 780. Dr. Green recommended that Venus use an AutoPAP device and also said this: "Given his obesity as manifest by a BMI of 36.5, [I] would discuss the role of weight loss in the long-term management of obstructive sleep apnea," id.

In January of 2015, the SSA determined that Venus had three physical impairments that were not severe (gastroesophageal reflux disease ("GERD"), hypertension, and restless-leg syndrome), and one severe physical impairment: reconstructive surgery of a weight-bearing joint. The SSA's Disability Determination Explanation form says nothing about obesity.

Also in January of 2015, a non-examining state-agency consultant, Dr. Craig Billinghurst, reviewed Venus's medical records and assessed his physical residual functional capacity ("RFC").[6] According to Dr. Billinghurst, Venus could lift and/or carry 10 pounds frequently and 20 pounds occasionally, stand and/or walk (with normal breaks) for a total of two hours, sit (with normal breaks) for more than six hours on a sustained basis in an eight-hour workday, and push and/or pull the same

---

[6] "[R]esidual functional capacity 'is the most [a claimant] can still do despite [his or her] limitations.'" Purdy, 887 F.3d at 10 n.2 (quoting 20 C.F.R. § 416.945(a)(1), a regulation governing claims for supplemental security income that is worded identically to 20 C.F.R. § 404.1545(a), which governs claims for DIB) (brackets in the original).

amount he could lift and/or carry.  With respect to postural activities, Dr. Billinghurst opined that Venus could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders/ropes/scaffolds.  With respect to environmental limitations, Dr. Billinghurst opined that Venus had an unlimited capacity for exposure to extreme cold; extreme heat; wetness; humidity; noise; and fumes, odors, dusts, and gases; but had to avoid concentrated exposure to vibration and all exposure to hazards (machinery, heights, etc.).  Finally, Dr. Billinghurst opined that Venus had no manipulative, visual, or communicative limitations.  Under the heading "Additional Explanation," Dr. Billinghurst listed 12 specific medical records he had reviewed when formulating his opinions.

In April and July of 2015, i.e., seven and ten months after Venus's DLI, he saw a gastroenterologist, Dr. Howard Mitz, for treatment of GERD.  After the second visit, Dr. Mitz gave three diagnoses: GERD, Barrett's,[7] and obesity.  In his office note, Dr. Mitz endorsed Venus's goal of losing weight.

In April of 2015, Venus saw Dr. Dougald MacArthur complaining of bilateral hip pain and asking Dr. MacArthur to

---

[7] Barrett syndrome is "chronic peptic ulceration of the lower esophagus . . . acquired as a result of long-standing esophagitis." Stedman's, supra note 1, at 1891.  Esophagitis is "[i]nflammation of the esophagus." Id. at 670.

fill out "Social Security paperwork." Tr. 691. Dr. MacArthur examined Venus and completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). In his office note, Dr. MacArthur reported that Venus "ambulate[d] into the office with a normal gait," Tr. 691, diagnosed Venus with hip pain, and noted "stable total hip arthroplasties" that showed no "radiographic signs of loosening or settling," id. He also reported that Venus weighed 260 pounds and recommended that he lose weight. He did not, however, list obesity as a diagnosis.

The medical-source statement form that Dr. MacArthur completed instructed him to "[i]dentify the factors (e.g., the particular medical signs, laboratory findings, or other factors . . .) that support[ed] [his] assessment of any limitations." Tr. 687. It continued: "IT IS VERY IMPORTANT TO DESCRIBE THE FACTORS THAT SUPPORT YOUR ASSESSMENT. WE ARE REQUIRED TO CONSIDER THE EXTENT TO WHICH YOUR ASSESSMENT IS SUPPORTED." Id.

In his medical-source statement, Dr. MacArthur opined that Venus: (1) could occasionally lift and/or carry 10 pounds; (2) stand and/or walk less that two hours in an eight-hour workday;[8] (3) needed to periodically alternate sitting and standing to relieve pain or discomfort; and (4) had a limited capacity for

---

[8] The medical-source statement form directed Dr. MacArthur to provide an explanation for that limitation, but he did not do so. See Tr. 687.

pushing and/or pulling with his lower extremities.[9]  The medical-
source statement form asked Dr. MacArthur to identify the
"medical/clinical finding(s) [that] support[ed] [his]
conclusion[s]" about Venus's exertional limitations.  Tr. 688.
He did not answer that question.  <u>See</u> <u>id.</u>  With respect to
postural activities, Dr. MacArthur opined that Venus could never
climb ramps, stairs, ladders, ropes, or scaffolds, and could
never balance, kneel, crouch, crawl, or stoop.[10]  He identified
no manipulative or communicative limitations, and only one
environmental limitation, a need to avoid vibration.  Finally,
Dr. MacArthur answered "yes," with no further elaboration, to
this question: "Is it medically reasonable to expect that this
patient's ability to maintain attention and concentration on
work tasks throughout an 8 hour day is significantly compromised
by pain, prescribed medication or both?"  Tr. 689.

In November of 2015, Venus was diagnosed with a gallbladder
polyp.  The next month, he had a laparoscopic cholecystectomy,[11]

---

[9] The medical-source statement form directed Dr. MacArthur
to "describe [the] nature and degree" of that limitation, but he
did not do so.  Tr. 688.

[10] The medical-source statement form directed Dr. MacArthur
to "fully describe and explain" those postural limitations, but
he did not do so.  Tr. 688.

[11] Laparoscopic cholecystectomy is a "minimally invasive
surgical technique for removal of the gallbladder."  <u>Stedman's</u>,
<u>supra</u> note 1, at 365.

and subsequent pathology led to a diagnosis of chronic cholecystitis.[12]

After the SSA denied Venus's application for DIB, he received a hearing before an ALJ. In a pre-hearing filing, Venus's counsel: (1) identified obesity as a "medically determinable severe impairment," Tr. 252; (2) stated that Venus listed his weight as 235 pounds (which translates to a BMI of 31.9) on his Adult Disability Report; (3) cited Dr. Nguyen's March 2013 office note which reported Venus's weight as 252 pounds and Dr. Nguyen's view that Venus's "hip pain [was] due . . . at least partly to obesity and walking," Tr. 253, 518; and (4) reminded the ALJ of the Social Security Ruling ("SSR") that directs SSA adjudicators to "do an individualized assessment of the effect of obesity on an individual's functioning when deciding whether [an] impairment is severe [at step two of the sequential evaluation process]," Tr. 253 (quoting SSR 02-1p, 2002 WL 34686281, at *4 (S.S.A. Sept. 12, 2002)).

At Venus's hearing, neither the ALJ nor Venus's counsel asked Venus about his weight or any functional limitations he experienced as a result of his weight. Venus offered no testimony on that topic.

_____

[12] Chronic cholecystitis is "chronic inflammation of the gallbladder." Stedman's, supra note 1, at 364.

However, the ALJ did pose a series of hypothetical questions to a vocational expert ("VE"). In the first one, he asked the VE to consider a person of Venus's same age, education, and work experience, and who had the following functional capacity:

> [A]ssume that he can lift 20 pounds occasionally, ten pounds frequently, can stand or walk for two hours in an eight hour work day. Sitting is more than six hours. Unlimited use of his hands and feet to operate controls and push and pull. Should never climb ladders, scaffoldings, or ropes. Gripping posturals are occasional. Should avoid a concentrated exposure to vibration and all exposure to unprotected heights and hazardous machinery.

Tr. 51. The VE testified that a person with that RFC could not perform Venus's past work but could perform the sedentary jobs of assembly worker, electronics inspector, and hand sorter. In response to a second question from the ALJ, the VE testified that if the person in the first hypothetical could never perform any of the postural activities, he would not be able to perform any jobs. Then, in response to questions from Venus's counsel, the VE testified that no jobs would be available for a person who needed to stand up to relieve pain for more than eight minutes per hour, who would miss more than three or four days of work per month due to pain or fatigue, or who was off task about 20 percent of the time because of pain.

After the hearing, the ALJ issued a decision in which he determined that Venus

had the following severe impairments: degenerative
disease of the hips status post-resurfacing surgery
September 2010 and status post bilateral hip
replacement (left=12/06/2013 and right April 4, 2014).

Tr. 14.  In making that determination, the ALJ expressly found

that hypertension, GERD, Venus's gallbladder condition, and

sleep apnea were not severe impairments.  He did not mention

obesity, but did

conclude[] that there is no evidence that any other
conditions have met the durational requirements of
this program, or that they create any specific
functional limitations regarding the claimant's
ability to perform basic work-related activities;
thus, they are considered not "severe."  Nevertheless,
the undersigned reviewed and considered all 'severe'
and 'non-severe' impairments in formulating [Venus's]
residual functional capacity.

Id.

Then, after determining that Venus's impairments did not

meet or medically equal the severity of any of the conditions

described in the SSA's listing of impairments that are per se

disabling, the ALJ determined that

through the date last insured, the claimant had the
residual functional capacity to perform light work as
defined in 20 CFR 404.1567(a) except that he is
limited from lifting/carrying more than 20 pounds
occasionally and 10 pounds frequently and from
standing/walking more than 2 hours total during the
day.  He is able to sit for more than 6 hours during
an 8-hour day and he has unlimited use of his hands.
He cannot climb, but he is able to occasionally

balance, stoop, kneel, crouch and crawl.  He has
unlimited use of his hands.[13]

Tr. 16.  Based upon the foregoing RFC, and the testimony of the
VE, the ALJ determined that Venus could not perform his past
work, but could perform the jobs of assembly worker, electronics
inspector, and inserter.[14]  On that basis, the ALJ determined
that Venus was not disabled.

### III. Discussion

A. <u>The Legal Framework</u>

To be eligible for disability insurance benefits, a person
must: (1) be insured for such benefits; (2) not have reached
retirement age; (3) have filed an application; and (4) be under
a disability.  42 U.S.C. § 423(a)(1)(A)-(D).  The only question
in this case is whether the ALJ correctly determined that Venus
was not under a disability from September 9, 2010, through
September 30, 2014, which is the date on which he was last
insured for DIB.

---

[13] It is not clear why the ALJ mentioned Venus's unlimited
capacity to use his hands twice but did not mention his ability
to use his feet at all.

[14] While the VE actually testified that the third job Venus
could perform was "hand sorter" rather than "inserter," both the
VE and the ALJ gave the same listing number from the <u>Dictionary
of Occupational Titles</u> and the same number of jobs in the
national economy for that occupation, so this discrepancy
appears to be of no moment.

To decide whether a claimant is disabled for the purpose of determining eligibility for DIB, an ALJ is required to employ a five-step sequential evaluation process. See 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Purdy, 887 F.3d at 10 (quoting Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001); citing 20 C.F.R. § 416.920, which outlines the same five-step process as the one prescribed in 20 C.F.R. § 404.1520).

At the first four steps in the sequential evaluation process, the claimant bears both the burden of production and the burden of proof. See Purdy, 887 F.3d at 9 (citing Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001)); see also Bowen v. Yuckert, 482 U.S. 137, 146 (1987). He must prove that he is disabled by a preponderance of the evidence. See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).[15]  Finally,

> [i]n assessing a disability claim, the [Acting
> Commissioner] considers objective and subjective
> factors, including: (1) objective medical facts; (2)
> [claimant]'s subjective claims of pain and disability
> as supported by the testimony of the claimant or other
> witness; and (3) the [claimant]'s educational
> background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

B.  Venus's Claims

Venus claims that the ALJ made four different errors in his

decision.  None of those claims has merit.  I consider each in

turn.

1. Sleep Apnea and Obesity

Venus claims that "[t]he ALJ erroneously failed to find

either sleep apnea or obesity to be medically determinable

impairments at step two, or consider them at step four."  Cl.'s

Mot. to Reverse (doc. no. 13) 13.  But, it is apparent from a

review of the record that the ALJ did find that claimant's sleep

apnea was a medically determinable impairment.  See Tr. 14.

---

[15] At step five, the burden of proof shifts to the Acting
Commissioner, see Seavey, 276 F.3d at 5 (citing Arocho v. Sec'y
of HHS, 670 F.2d 374, 375 (1st Cir. 1982)), but the Acting
Commissioner's step-five determination is not at issue here, so
there is no need to describe the mechanics of step five.

Thus, I presume that Venus's actual claim of error at step two is that the ALJ failed to determine that: (1) his OSA was a severe impairment; (2) his obesity was a medically determinable impairment; and (3) his obesity was a severe impairment. Furthermore, I presume that the step-four error that claimant identifies is actually a claim that the ALJ erred by failing to include limitations in his RFC arising from his OSA and his obesity.

**Sleep apnea**. At step two, the ALJ discussed Venus's treatment with Dr. Green for sleep apnea and then concluded:

> There are no records from any treating source indicating that this medically determinable impairment has had more than minimal effect on the claimant's ability to perform basic work functions. Therefore, the undersigned finds that this is . . . not a "severe" impairment within the meaning of the Social Security Act.

Tr. 14. Claimant counters by stating, without any citation to the record, that "sleep apnea . . . causes daytime sleepiness, necessarily affecting [Venus's] ability to concentrate, focus and pay attention," Cl.'s Mot. to Reverse (doc. no. 13) 13. To be sure, Dr. Green listed "excessive daytime sleepiness," Tr. 780, as a comorbid medical condition related to Venus's OSA, but he did so in his interpretation of a sleep study that was conducted more than three months after Venus's DLI, and Dr. Green's findings do not purport to be retrospective. Thus, as to the period when Venus was insured for DIB, the ALJ was

correct in his statement that "[t]here are no records from any treating source indicating that this medically determinable impairment has had more than minimal effect on the claimant's ability to perform basic work functions," Tr. 14. Accordingly, the ALJ did not err when he decided that Venus's OSA was not a severe impairment. Moreover, because there is no evidence in the record concerning the effects of OSA on Venus's ability to work, during the time when he was insured for DIB, the ALJ did not err by declining to include any OSA-based limitations in Venus's RFC. Given the lack of opinion evidence linking sleep apnea to any work-related limitations during the period when Venus was insured for DIB, the ALJ could not have included OSA-based limitations into Venus's RFC without interpreting raw medical data, which is impermissible. See Marino v. U.S. Soc. Sec. Admin., No. 17-cv-179-JL, 2018 WL 4489291, at *4 (D.N.H. Sept. 19, 2018) (citing Manso-Pizarro, 76 F.3d at 17; Giandomenico v. U.S. Soc. Sec. Admin., Acting Comm'r, No. 16-cv-506-PB, 2017 WL 5484657, at *4 (D.N.H. Nov. 15, 2017)).

**Obesity**. It is clear that from his alleged onset date through his DLI, Venus had a BMI that qualified him as obese under guidelines promulgated by the National Institutes of Health ("NIH"). See note 3, supra. And Venus is correct in his observations that: (1) Dr. Billinghurst did not discuss obesity in his RFC assessment; and (2) the ALJ did not mention obesity

anywhere in his decision.  Based upon the foregoing, Venus turns

to Thompson v. Commissioner of Social Security, No. 5:13-cv-

00318, 2015 WL 1467681 (D. Vt. Mar. 30, 2015), for the

proposition that the ALJ's failure to mention his obesity was a

reversible error.  While it is a close question, I disagree.

In Thompson, the district judge remanded where the ALJ did

not mention the claimant's obesity in his decision and found

that the claimant had no severe impairments.  However, there is

a better guide for my decision in this case: Desilets v. Colvin,

No. 15-cv-303-LM, 2016 WL 1275037 (D.N.H. Apr. 1, 2016).  In

Desilets, Judge McCafferty affirmed a denial of benefits where

the ALJ, like the ALJ in this case, did not mention the

claimant's obesity in his decision but found that the claimant

had other severe impairments that did not result in disability.

In Desilets, the claimant argued that the ALJ committed a

reversible error by failing to consider his obesity when

assessing his RFC.  Judge McCafferty disagreed:

> "[A]n ALJ is required to make an assessment 'of
> the effect obesity has upon the individual's ability
> to perform routine movement and necessary physical
> activity within the work environment.'"  Newell v.
> Colvin, No. 12-CV-480-S, 2014 WL 546761, at *5 (D.N.H.
> Feb. 10, 2014) . . . (quoting Social Security Ruling
> 02-1p, 2002 WL 34686281, at *6 . . .) . . . .
>
>     . . .  At the same time, however, "[i]t [is] up
> to [the claimant] to specifically allege how his
> obesity affected his ability to work during the period
> in question."  O'Dell v. Astrue, 736 F. Supp. 2d 378,
> 390 (D.N.H. 2010).  . . .

. . . .

> Turning . . . to O'Dell, Desilets criticizes the
> ALJ for failing to consider his obesity, but he did
> not identify obesity as a disabling impairment in his
> application for benefits, and he offered no testimony
> about the effects of obesity at his hearing.
> Moreover, neither of the two treating sources who
> offered opinions on Desilets' RFC listed obesity as a
> diagnosis.  Thus, as with the claimant in O'Dell, "it
> was up to [Desilets] to specifically allege how his
> obesity affected his ability to work during the period
> in question, and he failed to meet that burden."  736
> F. Supp. 2d at 390.  Accordingly, the manner in which
> the ALJ handled Desilets' obesity gives the court no
> reason to remand this case.

Desilets, 2016 WL 1275037, at *5-6; see also Jessica B. v.

Berryhill, No. 1:17-cv-00294-NT, 2018 WL 2552162, at *7 (D. Me.

June 3, 2018) (explaining that claimant's "failure to identify

any evidence that her obesity imposed greater functional

limitations than those found by the ALJ preclude[d] remand on

the basis of this point of error [i.e., the ALJ's failure to

explain the impact of claimant's obesity on her RFC]") (citation

omitted), R. & R. adopted by 2018 WL 4289314 (Sept. 7, 2018).

Here, the record does appear to establish that Venus's

obesity was a medically determinable impairment.  But Venus,

like the claimants in Desilets and O'Dell, has not alleged how

his obesity affected his ability to work prior to his DLI.  Like

the claimant in Desilets, Venus "did not identify obesity as a

disabling impairment in his application for benefits, and he

offered no testimony about the effects of obesity at his

hearing," 2016 WL 1275037, at *6.  As with the treating sources in Desilets, Dr. MacArthur listed Venus's weight (but not his BMI) in his office note, but did not list obesity as a diagnosis.  And, like the claimant in Jessica B., Venus has produced no evidence that his obesity imposed functional limitations any greater than those described in the ALJ's RFC assessment.

The closest he comes is his citation to a March 21, 2013, progress note in which Dr. Nguyen stated his belief that Venus's "hip pain [was] due . . . at least in part to obesity and walking."  Tr. 518.  But, in that same note, Dr. Nguyen said that Venus was able to walk five to ten miles a day, so that note hardly qualifies as evidence that Venus's obesity imposed much of a limitation on his ability to work.[16]  Moreover, Venus makes no allegations about obesity-induced pain, or limitations on his functional capacity imposed by such pain.  Finally, the single piece of medical evidence on which Venus relies for his claim that he was limited by obesity is a progress note that was written after his resurfacing surgeries, but before his total hip replacements, and there is no evidence in the record post-

---

[16] Furthermore, in his decision, the ALJ limited Venus to less than two hours of standing and walking per day, which would appear to entail less walking than the amount of walking that Dr. Nguyen said Venus could do.

dating his hip replacements but pre-dating his DLI that says anything about the effect of his obesity.

Given the record in this case, even assuming that the ALJ erred by failing to find that Venus's obesity was a medically determinable impairment, he did not commit a reversible error by failing to find that Venus's obesity was a severe impairment at step two or by failing to include additional obesity-related limitations in his RFC.

### 2. Step Three

In its review of Venus's application, the SSA determined that Venus had the severe impairment of reconstructive surgery of a weight-bearing joint, see Tr. 74, which corresponds to Listing 1.03 in the SSA's list of impairments that are per se disabling. In her pre-hearing brief, Venus's counsel asked the ALJ to evaluate his impairment under the criteria for Listing 1.03. For reasons he did not explain in his decision, the ALJ focused on Listing 1.02 (major disfunction of a joint due to any cause) at step three and did not consider Listing 1.03. In determining that Venus's impairment did not meet or equal Listing 1.02, the ALJ stated that Venus had not presented any medical evidence that he was unable to ambulate effectively.

Venus claims that "[e]ven though state agency reviewers correctly considered Listing 1.03, ALJ Merrill failed to consider that listing and failed to properly analyze the issue

of 'ability to ambulate effectively.'" Cl.'s Mot. to Reverse (doc. no. 13) 3. I consider each claim in turn.

As for Venus's first claim, he cites no authority for the proposition that an ALJ commits a reversible error by failing to consider a particular listing when performing a step-three analysis.[17] Moreover, as Venus acknowledges, he bore the burden at step three of producing evidence that his condition met or medically equaled the severity of a listed impairment. Thus, his step-three claim boils down to an assertion that the ALJ erred by failing to find that his hip condition met or medically equaled the severity of Listing 1.03.

Under the general heading of musculoskeletal impairments, Listing 1.03 provides that a person is disabled if he has had

> [r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.[18]

---

[17] Venus also criticizes the ALJ for considering Listing 1.02 rather than Listing 1.03, but the ALJ's discussion focused on ineffective ambulation, which is a requirement for both listings. So, even though the ALJ did not specifically cite Listing 1.03, he provided an analysis of Listing 1.02 that applies with equal force to Listing 1.03. Thus, the error with which Venus charges the ALJ had no effect on his decision.

[18] Arthrodesis is "[t]he stiffening of a joint by operative means." Stedman's, supra note 1, at 160.

20 C.F.R. Pt. 404, Subpt. P., App 1, Listing 1.03 (emphasis omitted). With respect to ineffective ambulation, the regulations provide the following definition:

> Inability to ambulate effectively means an extreme limitation of the ability to walk: i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00B2b(1). The regulations also define effective ambulation:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00B2b(2) (emphasis omitted).

In his motion to reverse, Venus claims that his hip impairment meets Listing 1.03 because "[h]e does not have the

ability to sustain a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living or the ability to walk at a reasonable pace on rough or uneven surfaces." Doc. no. 13, at 6. But he identifies no evidence to that effect in the record, and I have been unable to locate any. At his hearing, Venus testified that he was able to do various kinds of outdoor house and yard work, and that he was able to use the vacuum cleaner inside. He said nothing about any limitations on his ability to walk. And, in the single medical record on which he relies for the proposition that he could not ambulate effectively, a September 18, 2014, progress note written by Dr. Lawless six months after his right hip replacement and ten months after his left hip replacement, Dr. Lawless reported that Venus was: (1) "back to . . . walking around," Tr. 393; and (2) ambulating with neither an antalgic nor a Trendelenburg gait, see id.[19]

In short, Venus has failed to carry his burden of producing evidence that for any 12-month period after any of his hip surgeries, he suffered from an inability to ambulate effectively. Accordingly, the ALJ did not err, at step three,

---

[19] In his motion to reverse, Venus says that at his September 18, 2014, office visit, he "ambulated with an antalgic gait." Doc. no. 13, at 6 (emphasis added). But that is incorrect. The progress note from his September 18 office visit actually says: "He is ambulating without an antalgic gait." Tr. 393 (emphasis added).

by determining that Venus did not have a musculoskeletal impairment that met the conditions for a listed impairment.

### 3. Medical Opinions

In his decision, the ALJ gave substantial weight to Dr. Billinghurst's opinions, determined that the SSA's so-called treating-source rule did not apply to Dr. MacArthur's opinions, and afforded them little weight. Venus claims that "[t]he ALJ erred in his determination of the RFC, misinterpreting the only treating source statement of record and statements made by Mr. Venus." Cl.'s Mot. to Reverse (doc. no. 13) 7.[20] While the heading of Venus's third claim refers to the ALJ's purported misrepresentation of statements that he made, the text that follows says nothing about any such statements, so I construe Venus's third claim as asserting that the ALJ erred in weighing the medical opinions. He did not.

As noted, Venus claims that the ALJ erred by determining that the treating-source rule did not apply to Dr. MacArthur's opinions. The treating-source rule states:

---

[20] Venus also seems to criticize the ALJ for failing to "weigh[] the Billinghurst opinion against that of Dr. MacArthur," Cl.'s Mot. to Reverse (doc. no. 13) 7, but the basis for that claim is difficult to discern. The ALJ said that he "afforded greater weight to the opinion of the State Agency reviewing physician Dr. Billinghurst." Tr. 19. The only other opinion in the record was Dr. MacArthur's. Thus, the ALJ's statement that he gave greater weight to Dr. Billinghurst's opinion could not have resulted from anything other than

> If we find that a treating source's medical opinion on
> the issue(s) of the nature and severity of [a
> claimant's] impairment(s) is well-supported by
> medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent with the
> other substantial evidence in your [the claimant's]
> record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).[21]  As for what qualifies a medical

source as a treating source, the regulations provide:

> Treating source means [a claimant's] own acceptable
> medical source who provides [him], or has provided
> [him], with medical treatment or evaluation and who
> has, or has had, an ongoing treatment relationship
> with [him].  Generally, we will consider that [a
> claimant has] an ongoing treatment relationship with
> an acceptable medical source when the medical evidence
> establishes that [he sees], or [has] seen, the source
> with a frequency consistent with accepted medical
> practice for the type of treatment and/or evaluation
> required for [his] medical conditions(s).  . . .  We
> will not consider an acceptable medical source to be
> [a claimant's] treating source if [his] relationship
> with the source is not based on [his] medical need for
> treatment or evaluation, but solely on [his] need to
> obtain a report in support of [his] claim for
> disability.  In such a case, we will consider the
> acceptable medical source to be a nontreating source.

20 C.F.R. § 404.1527(a)(1) (emphasis added).

Here, Dr. MacArthur gave his opinion on the first day he

saw Venus.  His progress note explains:

> He presents today complaining of ongoing hip and thigh
> pain with Social Security paperwork, stating that he

---

weighing Dr. Billinghurst's opinion against that of Dr.
MacArthur.

[21] This rule applies to claims, such as Venus's, that were
filed before March 27, 2017.  See 20 C.F.R. § 404.1527.  For
claims filed on or after that date, a different rule applies.
See 20 C.F.R. § 404.1520c.

needs this filled out and that he has been turned down
multiple times in the past.

Tr. 691. Dr. MacArthur's examination notes state, in pertinent

part:

> He ambulates into the office with a normal gait.
> . . . Now looking at his left hip, he has a well-
> healed posterior incision. No signs of infection.
> Nontender throughout. Range of motion is free and
> easy and stable. Neurovascularly intact distally.
> Now looking at the right hip, nontender throughout.
> No signs of infection. Well-healed posterior
> incision. Free and easy range of motion and
> ligamentously stable. Neuro intact distally.

Id. Under the heading "Treatment," Dr. MacArthur wrote:

> I think these are stable total hip arthroplasties. I
> have advised the patient to stop smoking, lose weight,
> and increase his cardiovascular health. I filled out
> his Social Security paperwork for him today. I do not
> think he is capable any longer of a physical job, but
> he is certainly capable of sedentary work, and his
> paperwork indicates such.

Tr. 691-92.

Based upon the foregoing, I can find no fault with the

ALJ's determination that Dr. MacArthur does not qualify as a

treating source. To begin, Venus has not shown that the single

visit that resulted in Dr. MacArthur's opinion represents "a

frequency [of treatment] consistent with accepted medical

practice for the type of treatment and/or evaluation required

for [his] medical condition(s)." 20 C.F.R. § 404.1527(a)(2).

Turning to the rationale for the treating-source rule, the

regulations explain that

> treating sources . . . are likely to be the medical
> professionals most able to provide a detailed,
> longitudinal picture of [a claimant's] medical
> impairment(s) and may bring a unique perspective to
> the medical evidence that cannot be obtained from . .
> . reports of individual examinations.

20 C.F.R. § 404.1527(c)(2).  Here, of course, when Dr. MacArthur
gave his opinions, he had no relationship with Venus that could
have given him a longitudinal picture of Venus's impairments.
Rather, he had only the perspective he obtained from an
individual examination.  That is not the perspective of a
treating source.

Factually, Venus attempts to cast Dr. MacArthur's opinions
as treating-source opinions by: (1) pointing to a May 7, 2015,
notation in Dr. MacArthur's examination report; and (2)
criticizing the ALJ for failing to ask him about the nature of
his relationship with Dr. MacArthur or his subsequent visits to
him.  As to the former, the May 7 notation is an addendum to the
report on Dr. MacArthur's April 23 examination, not
documentation of a subsequent visit, and even if Venus did visit
Dr. MacArthur a second time on May 7, Dr. MacArthur's medical-
source statement is dated April 23.  As to Venus's second
argument, he does not say how any post-opinion visit to Dr.
MacArthur could turn pre-treatment opinions into the opinions of
a treating source.

Legally, Venus attempts to cast Dr. MacArthur's opinions as treating-source opinions by faulting the ALJ for relying on Petrie v. Astrue, 412 F. App'x 401, 404 (2d Cir. 2011) (affirming district court's affirmance of ALJ's decision not to give controlling weight to opinions of physician who only examined claimant once or to opinions of physician who signed two treatment notes, cosigned two others, and gave opinions more than a year after last seeing claimant). Venus argues that under First Circuit authority, as announced by Johnson v. Astrue, 597 F.3d 409 (1st Cir. 2009) (per curiam), Dr. MacArthur qualifies as a treating source. Johnson does not support Venus's position.

In Johnson, in support of a claim that she was disabled by fibromyalgia, the claimant relied upon an RFC assessment by the physician who treated her for that impairment. See 597 F.3d at 411. The ALJ gave that assessment little weight, in part because the doctor "had seen [the] claimant only three times at roughly three-month intervals," id., but "offered no explanation for, or citation in support of, her belief that Dr. Ali's treatment relationship with claimant had been too abbreviated to enable him to offer an informed opinion about claimant's physical capabilities," id. The court of appeals rejected the ALJ's reasoning, but there is nothing in Johnson that would allow me to upend the ALJ's determination that Dr. MacArthur was

not a treating source when he rendered his opinions. The
physician in Johnson gave his opinions after he had seen the
claimant three times over the course of 10 months. Here, by
contrast, Dr. MacArthur gave his opinions on the day he first
met Venus. In short, nothing in Johnson undermines the ALJ's
decision in this case, and the ALJ did not err in his
determination that when he gave his opinions, Dr. MacArthur did
not qualify as a treating source.

However, even if the ALJ had treated Dr. MacArthur's
opinions as the opinions of a treating source, his decision
provides a perfectly acceptable reason for not giving those
opinions controlling weight. Under the treating-source rule,
the opinions of a treating source are entitled to controlling
weight if, among other things, they are "well-supported by
medically acceptable clinical and laboratory diagnostic
techniques." 20 C.F.R. § 404.1527(c)(2). Here, as the ALJ
pointed out, Dr. MacArthur's progress note appears to include
nothing but normal findings, and Venus does not explain how
normal findings support the limitations that Dr. MacArthur
identified in his medical-source statement. Moreover, even when
specifically directed by the form he filled out to identify
clinical findings that supported his conclusions, Dr. MacArthur
did not do so. So, in two different ways, if Dr. MacArthur's

opinions qualified as those of a treating source, they lacked
the support necessary to qualify for controlling weight.

But, at the time he rendered his opinions, Dr. MacArthur
was not a treating source; he was an examining source.
According to Venus, "even if the ALJ had treated Dr. MacArthur's
opinion as an examining opinion, he was still not free to simply
reject it out of hand as he did."  Cl.'s Mot. to Reverse (doc.
no. 13) 10.  Venus appears to argue that because the ALJ
mentioned that he had gone to Dr. MacArthur to get Social
Security paperwork done, the ALJ rejected Dr. MacArthur's
opinions "out of hand."  The ALJ did rely in part upon his view
of Dr. MacArthur's opinions as having been based on a "one-time
evaluation, for advocacy and not for treatment," Tr. 19, which
echoes the language 20 C.F.R. § 404.1527(a)(2) (deeming medical
sources seen solely to obtain reports in support of applications
for benefits to be nontreating sources).  However, the ALJ also
discussed the medical evidence generated by Dr. MacArthur's
examination, and its failure to support Dr. MacArthur's
opinions.  Thus, Venus is mistaken in his claim that the ALJ
rejected his opinions out of hand.

Furthermore, I can find no fault with the ALJ's evaluation
of Dr. MacArthur's opinions under the rubric that applies to
opinions from examining sources.  The factors to consider when
weighing a medical opinion from such a source include: (1) the

medical source's relationship with the claimant; (2)

supportability; (3) consistency with the record as a whole; (4)

the medical source's specialization; and (5) other factors, such

as a medical source's understanding of SSA disability programs.

See 20 C.F.R. § 404.1527(c).  As to supportability, the

regulations explain:

> The more a medical source presents relevant evidence
> to support a medical opinion, particularly medical
> signs and laboratory findings, the more weight we will
> give that medical opinion.  The better an explanation
> a source provides for a medical opinion, the more
> weight we will give that medical opinion.

20 C.F.R. § 404.1527(c)(3).

The fact that Dr. MacArthur examined Venus rather than just

reviewing his medical records is a factor that bolsters his

opinions, as is his specialization as an orthopedist.  But, on

the other hand, Dr. MacArthur's failure to explain the

limitations he identified on his medical-source statement form,

and their lack of support from, or their inconsistency with, his

contemporaneous examination notes, are factors that favor

discounting his opinions.

The fact that Dr. Billinghurst merely reviewed Venus's

medical records rather than examining him is a factor that

favors discounting his opinions.  But, on the other hand, the

consistency of his opinions with the medical records as a whole

and his familiarity with the SSA disability programs are factors that bolster his opinions.

There is evidence pointing in either direction with respect to the amount of weight that should be accorded to the opinions of Dr. MacArthur and Dr. Billinghurst, and the ALJ weighed that evidence. It is not for the court to reweigh it, see Gillen v. Colvin, No. 16-cv-59-JL, 2017 WL 775785, at *6 (D.N.H. Feb. 28, 2017) (citing Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991); Tsarelka, 842 F.2d at 535), and I can see no basis for disturbing the ALJ's determination that Dr. Billinghurst's opinions were entitled to greater weight than Dr. MacArthur's opinions.

Venus also claims that the ALJ erred by relying upon Dr. Billinghurst's opinions because they were based upon an incomplete record. That claim provides no basis for a remand.

In his decision, after explaining why he was giving substantial weight to Dr. Billinghurst's opinions, the ALJ stated:

> Although additional treatment notes were admitted to the record after these opinions [i.e., Dr. Billinghurst's] were rendered, these additional treatment notes do not document any meaningful change or deterioration in the claimant's presentation and these opinions remain consistent with the evidence of record in its entirety.

Tr. 19. That is the full extent of the ALJ's analysis of the post-decision evidence; he does not identify the post-opinion

treatment notes he considered or explain his determination that they did not document any change in Venus's condition.

In his motion to reverse, Venus states that "Dr. Billinghurst . . . based his opinion on an incomplete record." Doc. no. 13, at 7. In a footnote, he cites Differ v. Colvin for the proposition that "[a] state agency consultant's opinion that is based on an incomplete record, when later evidence supports the claimant's limitations, cannot provide substantial evidence to support the ALJ's decision to deny benefits," No. 15-cv-029-JL, 2016 WL 927149, at *2 (D.N.H. Mar. 11, 2016) (quoting Snay v. Colvin, No. 13-cv-316-JD, 2014 WL 2616823, at *5 (D.N.H. June 12, 2014); citing Alcantara v. Astrue, 257 F. App'x 333, 334 (1st Cir. 2007)). That is the full extent of Venus's argument; he does not identify any specific evidence post-dating Dr. Billinghurst's opinions that would support greater limitations than those that Dr. Billinghurst found.

Where an ALJ determines that the record before a reviewing consultant was not materially changed by the addition of new evidence, he bears the burden of clearly explaining that determination. See Giandomenico, 2017 WL 5484657, at *4 (citing Alcantara, 257 F. App'x at 334 (explaining that ALJ erred by simply stating that "the record underwent no material change" without explaining his analysis)). The ALJ in this case does not appear to have carried that burden. But, unlike the

claimant in Giandomenico, who "specifically cite[d] 11 records postdating [the consultant's] review that he claim[ed] generally evince[d] additional diagnoses and worsening conditions," 2017 WL 5484657, at *3, Venus baldly asserts that the record before Dr. Billinghurst was incomplete, but goes no further and does not direct the court to any specific post-opinion evidence that materially changed the record before Dr. Billinghurst.

Because Venus's incomplete-record claim is significantly undeveloped, see Barup v. U.S. Soc. Sec. Admin, No. 16-cv-62-PB, 2017 WL 1194644, at *8 n.7 (D.N.H. Mar. 31, 2017) (explaining that "argument [that was] unsupported by record or case citations [was] not adequately developed") (citation omitted), any analysis I might perform on that issue would be speculative at best, and so I decline to address claimant's incomplete-record claim, see Montero v. Colvin, No. 12-cv-412-JL, 2013 WL 4042424, at *1 n.1 (D.N.H. Aug. 8, 2013) (declining to address insufficiently developed argument) (citing Dillon v. Astrue, No. 11-cv-328-PB, 2012 WL 4794360, at *8 n.4 (D.N.H. Oct. 9, 2012) ("declin[ing] to address the merits of a claim that the plaintiff either fails to raise or raises in a perfunctory manner"); McGrath v. Astrue, No. 10-cv-455-JL, 2012 WL 976026, at *1 n.5 (D.N.H. Mar. 22, 2012) ("Courts can only address issues properly before them and need not endeavor to resolve issues presented in [an] undeveloped manner.").

In sum, the way in which the ALJ evaluated the medical opinions in this case gives me no reason to reverse his decision.

### 4. Statements about Symptoms

Venus claims that "[t]he ALJ erred in evaluating [his] testimony and his credibility." Cl.'s Mot. to Reverse (doc. no. 13) 10. Specifically, he argues that the ALJ committed reversible error by: (1) evaluating his symptoms under SSR 96-7p rather than under the SSR that superseded it, i.e., SSR 16-3p; and (2) conducting an analysis that ran afoul of SSR 16-3p. I am not persuaded.

SSR 16-3p "provides guidance about how [the SSA] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims under Title[] II . . . of the Social Security Act." 2016 WL 1119029, at *1 (S.S.A. Mar. 16, 2016). Venus is correct in observing that SSR 16-3p superseded SSR 96-7p. See id.; see also Tellier v. U.S. Soc. Sec. Admin., Acting Comm'r, No. 17-cv-184-PB, 2018 WL 3370630, at *6 n.6 (D.N.H. July 10, 2018). Notwithstanding the replacement of SSR 96-7p by SSR 16-3p, the ALJ in this case cited both SSRs in his decision. See Tr. 17. Thus, it is not entirely clear that he applied SSR 96-7p rather than SSR 16-3p. But even if he had, reliance upon SSR 96-7p is not, standing alone, a reversable error. As Judge McCafferty has explained:

It is unclear whether Arseneau argues that the
decision must be reversed because the ALJ cited SSR
96-7P instead of SSR 16-3p.  To the extent she
intended to make that argument, it is unavailing.
Coskery [v. Berryhill], 892 F.3d [1,] 5-6
[(1st Cir. June 4, 2018)] (holding that regardless of
whether the ALJ should have applied SSR 96-7p or SSR
16-3p, the ALJ's decision was supported by substantial
evidence).

Arseneau v. Berryhill, No. 17-cv-398-LM, 2018 WL 3854795, at *7

n.6 (D.N.H. Aug. 14, 2018); see also Tellier, 2018 WL 3370630,

at *6 n.6 (explaining that "SSR 16-3p is materially the same as

its predecessor").  More importantly, Venus has not demonstrated

that the ALJ's evaluation of his symptoms violated the precepts

of SSR 16-3p.

Venus claims that the ALJ violated SSR 16-3p by making the

following statement in his decision:

The objective evidence in this claim falls short of
demonstrating the existence of pain and limitations
that are so severe that the claimant cannot perform
any work on a regular and continuing basis.  The
claimant testified to an extremely limited range of
functional abilities.  However, the objective medical
evidence of record does not fully support those
allegations.

Tr. 17.  If the ALJ had limited his evaluation of Venus's

statements about his symptoms to the passage quoted above, that

would have been a problem, because an "ALJ cannot reject the

veracity of the claimant's own statements . . . based solely on

the conclusion that they are unsubstantiated by the objective

medical evidence," Tellier, 2018 WL 3370630, at *6 (citing 20

C.F.R. § 404.1529(c)(2); <u>Clavette v. Astrue</u>, No. 10-cv-580-JL,
2012 WL 472757, at *9 (D.N.H. Feb. 7, 2012), R. & R. adopted by
2012 WL 472878 (Feb. 13, 2012); <u>Valiquette v. Astrue</u>, 498 F.
Supp. 2d 424, 422 (D. Mass. 2007). But that is not what the ALJ
did here. After noting the lack of support for Venus's
statements from the objective medical evidence, he went on to
discuss several of the so-called <u>Avery</u> factors, <u>see</u> 797 F.2d at
29, such as Venus's daily activities and the effectiveness of
various treatments he had received. Thus, the ALJ's analysis of
Venus's statements about his symptoms satisfies the directives
outlined in SSR 16-3p.

I conclude by noting that an ALJ might violate the
principles articulated in SSR 16-3p if he were to couch his
evaluation of a claimant's statements about his symptoms in
terms of his credibility. <u>See</u> SSR 16-3p, 2016 WL 1119029, at *1
("we are eliminating the use of the term 'credibility' from our
sub-regulatory policy, as our regulations do not use this term
[and] we clarify that subjective symptom evaluation is not an
examination of an individual's character"); <u>Moffitt v.
Berryhill</u>, No. 17-cv-280-JL, 2018 WL 4215013, at *5 (D.N.H.
Sept. 5, 2018) (explaining that SSR 16-3p "moves away from the
concept of credibility and reframes the requisite analysis for
evaluating a claimant's statements of symptoms"). But there is

nothing in the ALJ's decision to suggest that he impermissibly examined Venus's credibility or character in this case.

To summarize, the ALJ's assessment of Venus's statements about his symptoms does not warrant a remand.

## IV. Conclusion

Because the ALJ has committed neither a legal nor a factual error in evaluating Venus's claim, see Manso-Pizarro, 76 F.3d at 16, his motion for an order reversing the Acting Commissioner's decision, document no. 13, is denied, and the Acting Commissioner's motion for an order affirming her decision, document no. 15, is granted.  The clerk of the court shall enter judgment in favor of the Acting Commissioner and close the case.

**SO ORDERED.**

/s/ Paul Barbadoro
Paul Barbadoro
United States District Judge

January 9, 2019

cc:  Alexandra M. Jackson, Esq.
     Karen B. Fitzmaurice, Esq.
     Penelope E. Gronbeck, Esq.
     Terry L. Ollila, AUSA